UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ALICE HATZELL GUARDIAN OF THE ESTATE OF CHERYL HATZELL, ALICE HATZELL INDIVIDUALLY, and RICHARD HATZELL INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>THE HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY a/k/a WISHARD MEMORIAL HOSPITAL, WISHARD HEALTH SERVICES, ESKENAZI HEALTH, and ESKENAZI HEALTH FOUNDATION, INC. f/k/a WISHARD MEMORIAL FOUNDATION, INC.,<br><br>Defendants. | No. 1:15-cv-00964-LJM-TAB |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Alice Hatzell, Guardian of the Estate of Cheryl Hatzell ("Cheryl"), Alice Hatzell, Individually ("Alice") and Richard Hatzell ("Richard") (collectively, "Plaintiffs"), have moved for partial summary judgment on their claims brought under the Emergency Medical Treatment and Active labor Act ("EMTALA"), for failure to provide an appropriate medical screening examination and failure to provide stabilizing treatment of Cheryl at Wishard Hospital[1] in Indianapolis, Indiana, on May 29, 2013, and May 30, 2013. Defendants The Health and Hospital Corporation of Marion County, Wishard Health

---

[1] Wishard Hospital is now known as Sidney and Lois Eskenazi Hospital. Because all of the records referred to in this case are from Wishard, the Court will refer to the relevant hospital entity herein as "Wishard."

Services, Eskenazi Health and Eskenazi Health Foundation, Inc. (collectively, "Defendants"), have moved for summary judgment on Plaintiffs' claims, or, in the alternative partial summary judgment. Defendants assert that the EMTALA does not apply to Plaintiffs' claims, alleging that they sound in malpractice.[2] For the reasons stated herein, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for Partial Summary Judgment.

## I. FACTUAL BACKGROUND

The parties agree on the operative facts taken in the light most favorable to Plaintiffs; the Court summarizes them here. On May 29, 2013, Alice took Cheryl, her adult, mentally handicapped daughter, to the emergency room at Wishard Hospital because Cheryl had not been feeling well, was constipated and had not been urinating. Alice related to the emergency room receptionist that Cheryl "was lethargic, and that she wasn't-she wasn't having normal bathroom, like bowel movements or urinating, and that she need to see a doctor . . . ." Alice Hatzell Dep. at 17:19-25. A nurse took Cheryl's medical history from Alice. Alice and Cheryl were taken into an examination room where a nurse took Cheryl's vital signs. *Id.* at 18:5-19:5.

Dr. Robert Cantor, the emergency room resident physician of the day, arrived and inquired of Cheryl's complaints. Cantor Dep. at 8-9; Alice Hatzell Dep. at 19:14-20:2. Cheryl denied being in pain. *Id.* at 82:6-12. Alice told Dr. Cantor of Cheryl's lack of bowel movement for four days and Cheryl's lack of urination. *Id.* at 79:19-24, 20:5-11; Defs.'

---

[2] Defendants also assert, in part, that Eskenazi Health Foundation is entitled to summary judgment because it is not a "participating hospital" as that term is defined by the EMTALA. Dkt. No. 33 at 14. Plaintiffs do not dispute this proposition and summary judgment as to Eskenazi Health Foundation is hereby **GRANTED**.

Ex. 2. Cheryl then reported that her stomach hurt. Alice Hatzell Dep. at 82:13-15. Alice, upon inquiry from the doctor listed Cheryl's medications. *Id.* at 20:3-5. Alice reported that Cheryl had trouble with constipation in the past from her medications. *Id.* at 20:5-11. Alice further reported that a stool softener had been given the day before to no apparent avail, but Cheryl had been passing gas. *Id.* at 71:18-72:11. Alice also reported that Cheryl appeared to be having abdominal pain and that she had not eaten for a day. *Id.* at 71:18-72:11. Alice added that Cheryl had been depressed for a few days and that her activity had decreased. *Id.* at 70:17-24; Defs.' Ex. 1 at 3.

Dr. Cantor ordered a urinalysis. Wishard Chart at 14. In addition, Cheryl was taken to another room in the emergency room to run tests. Alice Hatzell Dep. at 20:17-22. An x-ray of Cheryl's abdomen was taken to assess whether she was constipated. Cantor Dep. at 54:4-12.

Cheryl was taken back to the room where Alice was waiting, and the two of them were moved to yet another room to wait for Dr. Cantor. Alice Hatzell Dep. at 20:25-21:12. Alice asked whether or not the nurse needed a urine sample from Cheryl and asked for a "hat" to place on the commode to collect one, which another nurse provided. *Id.* at 21:13-22:9. Alice declined help from the nurse. *Id.* at 22:5-9. Alice tried to get Cheryl to urinate for 15-20 minutes without success; a nurse checked in on them and Alice told her that Cheryl had not done anything. *Id.* at 22:12-23:7. The nurse responded that she would take Alice and Cheryl back to a room to meet with Dr. Cantor. *Id.*

The x-rays revealed that Cheryl had a moderate stool burden and Dr. Cantor prescribed Cheryl with a laxative. Defs.' Ex. 1 at 3-4; Alice Hatzell Dep. at 24:14-22. Dr. Cantor advised Alice of his diagnosis and stated that otherwise they could not find

3

anything physically wrong with Cheryl.  Alice Hatzell Dep. at 23:9-13.  Alice told Dr. Cantor that Cheryl had not urinated, despite Alice trying for an hour to get her to go in the hospital.[3]  *Id.* at 23:19-21.  Dr. Cantor repeated that the medical staff could not find anything physically wrong with Cheryl.  *Id.* at 23:21-23.  Alice then stated, "Well, what am I supposed to do?  I can't get her to urinate and I know she had [urinary tract infections] UTIs in the past and I'm afraid that she has a severe UTI."  *Id.* at 23:23-24.  Dr. Cantor advised Alice to have Cheryl follow-up with her primary care physician; Cheryl had an appointment already scheduled for the following Tuesday, June 4.  *Id.* at 24:2-10.  Cheryl was given a dose of stool softener, and Alice took Cheryl home.  *Id.* at 24:23-25:9, 30:3-14.

The order to perform a urinalysis was never carried out or followed up on by the Wishard staff.  There is no record in Cheryl's chart to indicate why the urinalysis had not been performed or discussed amongst the emergency room staff.  There is no dispute that Dr. Cantor knew how to diagnose and treat patients with a urinary tract infection and that an untreated urinary tract infection can lead to renal failure, uremia, bladder rupture and impairment of bodily functions.  Cantor Dep. at 11, 18-21.  Further, Dr. Cantor knew that a urinalysis would help determine whether a patient had a urinary tract infection or impaired kidney function.  *Id.* at 60.  Dr. Cantor also knew the protocols for patients who present with a concern for acute urinary retention, urinary tract infection, and/or an outlet obstruction.  *Id.* at 25-58.  Dr. Cantor did not recall either being told about Cheryl's inability to void or that the urinalysis that had been ordered had not been performed.  *Id.* at 52-53.

---

[3] Defendants dispute that Alice said anything at all about Cheryl's difficulty urinating, but for purposes of summary judgment, the Court is using the facts most favorable to Plaintiffs.

4

Once she was at home, Cheryl went to bed.  Alice Hatzell Dep, at 24:23-25:9, 30:3-14.  The laxative worked; Cheryl woke up Alice in the middle of the night because of the mess in her bed.  *Id.* at 30:15-24.  Alice and Richard cleaned up Cheryl in the bathroom.  *Id.* at 30:25-31:11.  They placed Cheryl on the commode, but she fell off of it.  *Id.* at 31:11-17.  Once Cheryl was dressed again, she headed back to bed.  *Id.* at 31:18-24, 31:25-32:7.

The next day, on May 30, Cheryl fell down the stairs of her home and the family called for an ambulance.  *Id.* at 32:17-33:6.  Emergency Medical Technicians ("EMTs") found Cheryl at the bottom of the stairs when they arrived.  *Id.* at 33:13-18.  Cheryl was unresponsive and disoriented at first, but later repeated the phrase, "I'm tired," after being moved by the EMTs.  *Id.* at 86:6-22.  Alice advised the EMTs that Cheryl had been seen the previous day "because she was not going to the bathroom."  *Id.* at 87:13-17.

Cheryl was taken by ambulance to Wishard hospital.  *Id.* at 33:22-34:14.  Once she arrived at the emergency room, medical staff ran a number of screening procedures to assess Cheryl's injuries from the fall, including a CT scans of the head, C-Spine, and Maxillofacial bones, as well as an x-ray of her ankle and chest.  Perry Dep. at 27:23-28:2 & Defs.' Ex. 5, at 2.

According to Alice, when she arrived in Cheryl's room she observed that Cheryl seemed to be in "La La Land" and was not talking or doing anything.  Alice Hatzell Dep. at 35.  The chart reflects that Cheryl was complaining of "tummy pain."  Wishard Chart at 35. Dr. Eric Savory, the emergency room resident on duty on May 30, advised Alice and her older daughter, Cynthia Perry (who had been called to the hospital by Alice), that the only thing they had found wrong with Cheryl was a broken nose.  Alice Hatzell Dep. at

5

35:18-36:3. Because there was no treatment available for the broken nose, Dr. Savory told Alice to have Cheryl's primary care physician look at it in two to three days. Cynthia told Dr. Savory that something was wrong with her sister, because her behavior was not normal. Perry Dep. at 31:25-34:11. Alice agreed. Alice Hatzell Dep. at 33:8-10. Alice claims that she also told Dr. Savory that Cheryl had not urinated in days and asked what the medical staff was going to do about it. *Id.* at 36:6-15. Alice claims that Cheryl's abdomen was noticeably distended. Alice Hatzell Supp. Aff. Dr. Savory responded that the medical staff could not find anything physically wrong with Cheryl. Alice Hatzell Dep. at 36:17-37:24. He discharged Cheryl and told Alice to follow up with Cheryl's primary care physician the following Tuesday. *Id.*

Dr. Savory was generally familiar with the protocol regarding care of emergency department patients presenting with particular problems, including urinary tract problems. Savory Dep. at 10-11, 16-17. Dr. Savory was also familiar with common tests that would be performed if a patient had acute urinary retention. *Id.* at 17-18, 20-21. Further, when a patient with limited ability to communicate due to a mental disability arrived at the emergency room, it was customary to try to obtain medical history from the family and review any hospital records of which the staff was aware. *Id.* at 24-25. Further, Dr. Savory knew the protocols and/or standard procedure if a patient had not been urinating or had repeated episodes of unsteadiness or falling. *Id.* at 26-34. There is no evidence in Cheryl's chart that anyone in the emergency room questioned Alice or Cynthia about Cheryl's medical history or that a "systems review" of Cheryl had been performed on May 30.

After her release from the hospital, Cheryl returned home with Alice and Cynthia. *Id.* at 47:19-48:1. Alice reported to friends that Cheryl was resting at home and that the hospital could not find anything physically wrong with her; Alice suggested that there might be other causes of Cheryl's behavior such as medication dosage. Zimmerly Decl., Ex. 1.

Over the weekend, Cheryl was not eating and not drinking much. Alice Hartzell Dep. at 45:20-23. Although Cheryl's condition was consistent over the weekend, on Monday, June 3, Cheryl became worse. *Id.* at 48:7-15. Alice did not immediately take Cheryl back to the hospital because they had the appointment with Cheryl's physician the next day. *Id.* at 48:16-25. However, on the morning of Tuesday, June 4, Cheryl had become nonresponsive, so Alice took Cheryl directly to the emergency room at IU Hospital. *Id.* at 49:1-18.

Lab tests and a urinalysis were immediately ordered and performed. *Id.* at 101-04. The admitting notes include a history that Cheryl had suffered previously from urinary outlet stenosis and outlet obstruction that required dilation. IU Health Chart at 472. The lab results were extremely and dangerously abnormal. *Id.* at 26-31, 471-83, 535-40. Cheryl was in acute renal failure and, among the initial diagnoses, was a urinary tract infection. *Id.* She was promptly catheterized and returned an immense amount of urine, 230 mL of dark urine, which is well over a half gallon. *Id.*

Cheryl was admitted to the hospital with acute kidney injury, likely post obstructive. IU Health Chart at 535-36. The discharge summary included a neurologist's finding that Cheryl's altered mental status was likely due to toxic metabolic or uremic encephalopathy

7

from the acute renal failure. *Id.* Cheryl required acute rehabilitation and, at discharge, she was taken to a rehabilitation facility. *Id.*

Cheryl suffered permanent physical and mental disabilities. She can no longer walk unassisted, dress herself or get out of bed on her own; she also lacks fine motor skills. Alice Hatzell Aff. at 2. Cheryl's family must cut up her food and help her eat. *Id.*

On June 19, 2015, Cheryl's estate, Alice and Richard filed this action alleging that Defendants violated the EMTALA when they failed to properly screen Cheryl for urinary outlet stenosis and urinary tract infections on May 29 and May 30, and failed to stabilize her before discharging her from the emergency room on both occasions. Alice and Richard assert that they have standing under the EMTALA "for the personal harm [they] suffered as a direct result of the [D]efendants' violations of the Act." Specifically, because Cheryl is totally dependent upon them for her care and support, Alice and Richard have suffered emotional distress, worry, loss of the enjoyment of life, and expense.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is

sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III.  DISCUSSION

Plaintiffs allege violation of the EMTALA,[4] which is commonly known as the federal anti-dumping statute, 42 U.S.C. § 1395dd.  Subsections (a) and (b) of that statute read as follows:

> **(a) Medical screening requirement**
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
>
> **(b) Necessary stabilizing treatment for emergency medical conditions and labor**
>    **(1) In general**
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
>> **(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>> **(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

---

[4] Plaintiffs have not brought claims of negligence in this action; their claims are based solely on the EMTALA.  Dkt. No. 1-1.

42 U.S.C. § 1395dd.

These requirements were promulgated to prevent a perceived phenomenon known as "patient dumping." Congress was attempting to prevent a hospital emergency room from refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized. *See Beller v. Health & Hosp. Corp. of Marion Cty., Ind.*, 703 F.3d 388, 390 (7th Cir. 2012); *Johnson v. Univ. of Chi. Hosps.*, 982 F.2d 230, 233 n.7 (7th Cir. 1993). It is important to note that the statute only requires a hospital to stabilize an emergency medical condition that they actually know about. *See Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996). Therefore, if Wishard fulfilled its screening requirement with respect to Cheryl then any stabilization claim necessarily fails.

An appropriate medical screening is, in large part, determined by the hospital. *See Summers v. Baptist Med. Ctr Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996) (citing *Vickers*, 78 F.3d at 143; *Correa v. Hosp. San Fran.*, 69 F.3d 1184, 1192-93 (1st Cir. 1995), *cert. denied Hosp. San Fran., Inc. v. Correa*, 517 U.S. 1136 (1996)). To determine if a hospital's screening meets the statutory requirement, some cases in this district have adopted the test from the Ninth Circuit:

> [A] hospital satisfies EMTALA's "appropriate medical screening" requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not "designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily harm."

*Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir. 1995)).

The gravamen of Plaintiffs' Complaint is: "The fact that the urinalysis was not performed and that Cheryl was unable to urinate provides further evidence of Cheryl's urinary issues and the staff's awareness of those issues. The ordered urinalysis test was not performed and the order was not canceled." This failure to perform the test, once indicated, say Plaintiffs, is a failure to receive an appropriate screening.

But, Plaintiffs concede that for both visits, the hospital undertook an assessment of Cheryl's condition upon intake and a physical examination was performed by a physician to make a preliminary diagnosis and order tests. On both visits, multiple tests were run to diagnose potential problems Cheryl faced. The failure to follow up on certain concerns of the family or even suspicions of the doctor may fairly be regarded as malpractice. But, on the facts here, the hospital treated what the doctors perceived to be Cheryl's maladies, constipation in the first visit, and injuries/complications from a fall down stairs in the second visit; and there is no evidence that individuals who presented with the same symptoms would have received different treatment. *Accord Summers*, 91 F.3d at 1139 (concluding that the failure to perform a chest x-ray on a patient complaining of cracking or popping noises in his chest was not actionable under the EMTALA because the patient received substantive medical treatment, albeit potentially negligent treatment); *Vickers*, 78 F.3d at 143 (concluding that the failure to perform diagnostic testing for intracranial injury on a patient who presented with a "severe" laceration in this scalp was not actionable under the EMTALA because the patient had received an "initial screening examination" equal to that of other patients; misdiagnosis was not covered); *Evitt v. Univ. Heights Hosp.*, 727 F. Supp. 495, 497 (S.D. Ind. 1989) (concluding that the failure to perform a 12-lead EKG test on a patient complaining of chest pains was not actionable

under the EMTALA because the patient's complaint was one of misdiagnosis not disparate treatment).  In other words, on both visits, the hospital performed an initial screening examination that, in hindsight, was unfortunately flawed; but the EMTALA protects against disparate treatment upon initial screening, not against misdiagnosis.  Further, this is a not a case in which it could be said that Cheryl received cursory examination because she underwent multiple tests on both visits to this hospital.

### IV. **CONCLUSION**

For the reasons stated herein, Defendants', The Health and Hospital Corporation of Marion County, Wishard Health Services, Eskenazi Health and Eskenazi Health Foundation, Inc., Motion for Summary Judgment is **GRANTED**; Plaintiffs', Alice Hatzell, Guardian of the Estate of Cheryl Hatzell, Alice Hatzell, Individually and Richard Hatzell, Motion for Partial Summary Judgment is **DENIED as MOOT**.  The Court will enter judgment accordingly.

IT IS SO ORDERED THIS 18th day of November, 2016.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Morris L. Klapper
ATTORNEY AT LAW
mlklaw11@gmail.com

Mary M. Ruth Feldhake
BOSE MCKINNEY & EVANS, LLP
mfeldhake@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Michael Warren Holland
HOLLAND & HOLLAND LLC
mholland@hollandandhollandlaw.com